**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

————————————————————————

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **v.**　　　　　　　　　　　　　　　　**05-CR-250A - 02**

**ELADIO RODRIGUEZ,**

      **Defendant.**

————————————————————————

### REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report

upon dispositive motions.

### PRELIMINARY STATEMENT

The defendant, Eladio Rodriguez ("the defendant"), is charged in a

superseding indictment along with three co-defendants with having violated Title 21

U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 (Count 6); Title 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B) (Count 7) and Title 21 U.S.C. §§ 924(c)(1) (Count 9).  (Docket #28).  He

has filed a motion seeking to suppress evidence that was seized on February 3, 2006.

(Docket #39).[1]  The government filed a response in opposition to the defendant's

---

[1] As part of his motion to suppress, the defendant claimed that no search warrant had been issued authorizing the search of his residence at 233 East Street, Buffalo, New York thereby making the search of his home and the seizure of evidence therefrom illegal and in violation of the Fourth Amendment to the United States Constitution.  At the commencement of the evidentiary hearing, counsel for the defendant acknowledged that the government had produced the search warrant for defendant's residence and therefore, that part of his motion was withdrawn.

motion.  (Docket #49).

An evidentiary hearing was conducted by this Court on January 29, 2007 and a transcript of the proceedings was filed on March 2, 2007.  (Docket #54).  Post-hearing memoranda were filed on behalf of the defendant and the government. (Docket #s 57 and 58, respectively) and the matter was taken under advisement.

## **FACTS**[2]

Special Agent ("SA") Joseph Bongiovanni of the DEA testified that sometime in December 2005, an investigation of the defendant was commenced based on information received from two confidential informants ("CI-1, CI-2").  CI-1 was a person having "intimate knowledge of [the defendant's] residence and was actually asked to do certain things for [the defendant]" such as "possibly accept packages on his behalf."  CI-1 informed S.A. Bongiovanni that the defendant may be receiving kilograms of cocaine from Puerto Rico through the U.S. mails and provided specific address information as to where the drug packages from Puerto Rico were being delivered. These addresses were 233 East Street, Buffalo, New York, that being the residence of the defendant, and 22 Glenn Street, Buffalo, New York.  (T. 7-9).[3]

---

[2] The facts are gleaned from the testimony and hearing exhibits produced at the evidentiary hearing on January 29, 2007.

[3] "T" indicates reference to the Transcript of the evidentiary hearing (Docket #54), and the numbers following reference the pages of that transcript.

A review of "U.S. Postal historic information" was conducted, which review established that there had been "package deliveries from Puerto Rico to [233 East Street and 22 Glenn Street]."  (T. 9, 13).  Express Mail receipts for deliveries to 22 Glenn Street, Buffalo, New York were reviewed and it was established that two packages in October 2005 and one package in November 2005 had been delivered from Puerto Rico to that address.  One of the receipts for a package delivered appears to have been signed by an "Eladio Rodriguez."  (T. 13-15).  Photocopies of the Express Mail receipts were made.  (Government Exhibit 3).  Express Mail receipts for deliveries to 233 East Street were reviewed and it was established that six packages had been delivered from Puerto Rico to that address during October and November 2006.  Photocopies of the Express Mail receipts were made.  (Government Exhibit 7).

Thereafter, a package from Puerto Rico destined for delivery to "Edwin Rodriguez" at 22 "Gleen" Street, Buffalo, New York was intercepted and searched pursuant to a search warrant issued by Judge Scott on December 9, 2005.  (Government Exhibit 1).  S.A. Bongiovanni and Postal Inspector Wilbur determined that there was no "Gleen" Street in the City of Buffalo.  However, because the zip code on the package was the same as that for Glenn Street, and because of the "close proximity of the street name," the package was "deliverable to 22 Glenn Street, Buffalo, New York."  (T. 10-12).

"Upon opening the package [they] discovered a brick of cocaine measuring out to approximately 1000 grams, 1 kilo" which was field tested and a

"positive presence of cocaine hydrochloride" was established.  (T. 12).

In January 2006, CI-2 was utilized to obtain information about the defendant.  CI-2 is an individual who "was employed in a proactive manner by which he would telephonically contact and personally meet with [the co-defendant] Mr. Wilfredo Carrero." CI-2 also had contact with the co-defendant Colon.  (T. 16).  It was the objective of CI-2 "to gather information as to imminent arrival of narcotics that entered the Buffalo area."  (T. 16).

Prior to February 3, 2006, CI-2 met with Wilfredo Carrero who spoke about "an imminent arrival of narcotics believed to be coming into Buffalo from Chicago, IL"  (T. 17).  At the same time, CI-1 was providing additional information "as to the whereabouts of [the defendant] as to his journey to Chicago, IL and basically when he was returning.  It was believed that [the defendant] was in Chicago to retrieve and transport narcotics back to the Buffalo area."  (T. 17-18).

In February 2006, an order authorizing a pen register on the cell phone of the defendant was obtained from Judge Scott.  (Government Exhibit 4).  This order authorized the agents to determine from "ping site towers" the "approximate location of [the defendant]" when he was using his cell phone.  (T. 18).  By utilizing this technique, it was determined that the defendant was en route "from an area close to Chicago, IL" on February 2, 2006 and travelling east toward "the western New York area."  (T. 22-25).

-4-

On February 3, 2006, the defendant was observed in his automobile at his residence, and a "rolling surveillance" of the defendant was established for the entire day.  (T. 27).  A similar "rolling surveillance" was placed on the co-defendant Carrero on February 3, 2006 since information had been "received from phone calls initiated by CI-2 over a course of days leading up to February 3rd . . . because [the agents] felt it was imminent that [Carrero] was going to receive a shipment of narcotics that day."  (T. 27-28).  In the late afternoon of February 3, 2006, a delivery of cocaine to CI-2 was arranged through a "controlled phone call" initiated by CI-2 under the direction of the agents to the co-defendant Carrero, whereby the delivery of one and one-half kilos of cocaine would be made to CI-2 at the Burger King restaurant located at the corner of Busti and Porter.  The delivery was to be made by the co-defendant Laureano, who is the brother-in-law of Carerro.  (T. 28-29, 31).

Agents established surveillance of the Busti-Porter area on February 3, 2006 and observed the actual delivery by Laureano to CI-2 at "approximately 7:45-8:00 p.m."  As a result, both parties were arrested and the materials delivered by Laureano were field tested and "found as being positive for the presence of cocaine."  (T. 29, 31-32).  A search of Laureano established that he lived at 79 Condon Street.  Surveillance of the defendant previously established that he had visited 79 Condon Street a number of times.  (T. 30, 44).  Around 4:00 p.m. on February 3, 2006, the defendant was observed entering 79 Condon Street while "carrying something in his hand, a bag in his hand."  (T. 45).  Shortly thereafter, the defendant exited 79 Condon Street and drove to 22 Glenn Street, which Detective Torre understood to be a "possible stash house for

-5-

this organization." (T. 44-46).  The defendant was observed entering 22 Glenn Street where he remained "for a little over a half hour."  At approximately 5:00 p.m. on February 3, 2006, the defendant exited 22 Glenn Street and drove to 162 West Ferry Street with a passenger in his vehicle.  They parked in front of that location and sat in the vehicle "for a good half hour or 45 minutes."  The defendant then drove to 22 Glenn Street "and dropped off the occupant [of his vehicle] and then returned to 233 East Street."  (T. 47-48).

During the course of the "stakeout" at the Burger King at Busti and Porter on February 3, 2006, S.A. Bongiovanni made application to Judge Scott for search warrants for 22 Glenn Street, 233 East Street and 79 Condon Street.  (Government Exhibit 8).  The affidavit in support of this application described in substantial detail the information obtained from CI-1 and CI-2 as well as what had been observed and determined by the agents in the course of their investigation of the defendant and co-defendants Carerro and Laureano, including the delivery of the one and one-half kilos of cocaine by Laureano to CI-1.[4]  (*See* Government Exhibit 8).  Judge Scott signed the search warrants for 233 East Street, 22 Glenn Street and 79 Condon at 9:20 p.m. on February 3, 2006.  (T. 32).  Two Hundred Thirty-Three East Street was the residence of the defendant.  (T. 33).

---

[4] In his affidavit sworn to February 3, 2006 (Government Exhibit 8), S.A. Bongiovanni refers to the confidential informant as "CI-1" but in his testimony on January 29, 2007, he referred to this informant as "CI-2."  (T. 28-30).

"At 9:35 p.m." on February 3, 2006, S.A. Kasprzyk "called [Detective Torre] and told [him] that the warrants had been signed about ten minutes ago from (sic) Judge Scott." Detective Torre was part of the surveillance team that was surveilling 233 East Street at that time as was Agent Higgins. (T. 49-50).

Just before the agents were preparing to execute the warrant for 233 East Street, the defendant was observed leaving the premises and entering his vehicle and driving away. The agents followed the defendant's car and Agent Higgins turned his warning lights and siren on in order to have the defendant stop his vehicle, but the defendant continued driving. As a result, the task force agents who had been following him "boxed him in" with their vehicles at Bird and Niagara Streets. Detective Torre "approached the driver's side" and observed the defendant's "hands above his head into the roof liner of the car" and "it looked like he was fussing with the roof liner of the car." Detective Torre drew his weapon and "told [the defendant] to put his hands where [Torre] could see them." The defendant was then removed from his vehicle.

Detective Torre examined the area in defendant's car where he had observed the defendant's hands and saw "a bag protruding from that area" which he "retrieved." The contents were field tested and "showed positive for the presence of heroin." A cell phone was also removed from the defendant's car. The defendant was taken into custody at approximately 9:40-9:50 p.m. on February 3, 2006. (T. 49-53).

The agents did not have a search warrant for the defendant's person or his vehicle nor did they have an arrest warrant for the defendant.  (T. 56-57).

Detective Torre testified that they stopped the defendant because they "had a signed search warrant and [the defendant] just left the residence . . . and [he] wasn't going to allow anyone to leave the residence after the search warrant was signed where (sic) he may be carrying contraband away from the scene" since he knew that the occupant of 79 Condon Street had been arrested at a Burger King upon delivering a kilo and one-half of cocaine.  (T. 56-58).

## DISCUSSION AND ANALYSIS

The defendant has filed a motion seeking to suppress the use of the evidence seized from his vehicle on February 3, 2006 claiming that the "officers acted unreasonably in seizing [the defendant] and that the evidence seized was "the fruit of an illegal seizure."  (Docket #57, p. 3).  The defendant relies on the testimony of Detective Torre wherein the detective testified that "he was not going to allow anyone to leave the residence when he may be carrying contraband away from the scene" in support of his claim that the officers lacked probable cause for seizing the defendant and conducting the search at issue.  (T. 57-58) (Docket #57, pp. 3-4).

There is no question that the defendant was arrested prior to the implementation of the search warrant for his residence at 233 East Street.  Nor is there

any question that there was no arrest warrant for the defendant at the time of his arrest

on February 3, 2006; nor was there a search warrant for his automobile.


As a result, the defendant argues that there was no probable cause for his

arrest and the subsequent search of his automobile which resulted in the seizure of

contraband.  The defendant further asserts that this detention or seizure on February 3,

2006 could not be considered a valid *Terry* stop (*Terry v. Ohio*, 392 U.S. 1 (1968).

(Docket #57, pp. 5-6).


> The law is settled that in Fourth Amendment terms a traffic
> stop entails a seizure of the driver "even though the purpose
> of the stop is limited and the resulting detention quite brief."
> (internal citations omitted).

*Brendlin v. California*, _____ U.S. _____, 127 S.Ct. 2400, 2406 (2007); *United States v.*

*Baldwin*, _____ F.3d _____, 2007 WL 2092726 (2d Cir. 2007).


Whether the stop of the defendant's vehicle on February 3, 2006 was

done as a *Terry* stop or an outright arrest does not have to be analyzed or debated for it

is this Court's opinion, for the reasons hereinafter stated, that there was probable cause

for the arrest of the defendant on February 3, 2006 and the subsequent search of his

automobile.  The record of the evidentiary hearing establishes that the agents activated

the siren and flashing lights on their vehicle so as to communicate to the defendant that

he was to stop his vehicle; and that when the defendant failed to stop, the agents

operated their vehicles, consisting of eight or nine in number, in an aggressive manner

so as to block the defendant's course or otherwise control the direction or speed of his

movement; and after having stopped the defendant's vehicle, they approached the

defendant with a drawn or displayed weapon.  (T. 51-52).  The totality of these

circumstances cause this Court to conclude that a seizure of the defendant had been

made to the extent that it constituted an arrest of the defendant.  *See Michigan v.*

*Chesternut*, 486 U.S. 567, 575 (1988); *United States v. Mendenhall*, 446 U.S. 544, 553

(1980); *Terry v. Ohio*, 392 U.S. 1 (1968).

The fact that Detective Torre was stopping the defendant because they

had a search warrant for the defendant's residence at 233 East Street and that the

defendant had just left that residence is of no legal consequence or support for the

defendant's position.

As the United States Supreme Court has stated:

> Our cases make clear that an arresting officer's state of
> mind . . . is irrelevant to the existence of probable cause.
> [H]is subjective reason for making the arrest need not be the
> criminal offense as to which the known facts provide
> probable cause."  (internal citations omitted).

*Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Scott v. United States*, 436

U.S. 128, 138 (1978); *United States v. Cooper*, 2006 WL 931511 (W.D.N.Y. 2006).

Therefore, the issue to be decided is whether there was legal probable

cause for stopping the defendant's vehicle on February 3, 2006 and arresting him and

thereafter searching his automobile.

> Probable cause exists if a law enforcement official, on the
> basis of the totality of the circumstances, has "knowledge or
> reasonably trustworthy information sufficient to warrant a
> person of reasonable caution in the belief that an offense
> has been committed by the person to be arrested. *Panetta*
> *v. Crowly*, 460 F.3d 388, 395 (2d Cir. 2006)."

*United States v. Howard*, 489 F.3d 484, 491 (2d Cir. 2007).

The following circumstances, viewed in their totality, clearly establish that

probable cause existed for the arrest of the defendant on February 3, 2006 and the

subsequent search of his vehicle and the seizure of the evidence therefrom:

(a)     The prior information supplied by CI-1 to the agents and

subsequent corroboration of same about postal deliveries from

Puerto Rico to 233 East Street and 22 Glenn Street;

(b)     The interception of the package containing contraband destined for

delivery to 22 Glenn Street;

(c)     The prior information supplied by CI-2 about his conversations with

the co-defendants Carrero and Colon regarding drug arrivals in the

Buffalo area;

(d)     CI-1's disclosure to the agents about the defendant's trip to the

        Chicago, IL area for purposes of picking up drugs;


(e)     The pen register surveillance of the defendant on February 2, 2006

        placing him in "an area close to Chicago, IL" and traveling eastward

        to the "western New York area;" (T. 22-25)


(f)     The observation of the defendant's entrance into 79 Condon, the

        residence of the co-defendant Laureano, on February 3, 2006 at

        approximately 4:00 p.m. while "carrying something in his hand, a

        bag in his hand;" (T. 45)


(g)     The arranged phone call by CI-2 in the late afternoon on

        February 3, 2006 to the co-defendant Carrero wherein a delivery

        of cocaine was to be made to CI-2 by the co-defendant Laureano,

        who is the brother-in-law of the co-defendant Carrero, at the Burger

        King located at Busti and Porter;


(h)     The observation by the agents of the actual delivery of cocaine by

        co-defendant Laureano to CI-2 at the Burger King location and the

        seizure of said contraband which field tested positive for cocaine

        on February 3, 2006 at approximately 7:45-8:00 p.m.;

(i)     The observation of the defendant's entry into 22 Glenn Street at

approximately 4:30 p.m. on February 3, 2006 by the agents and

departure therefrom at approximately 5:00 p.m. along with a

passenger and the unusual sojourn to 162 West Ferry Street;

(j)     The issuance of a search warrant by Judge Scott for the search of

233 East Street, that being the residence of the defendant.

The issuance of the search warrant by Judge Scott for the search of the

defendant's residence at 233 East Street on February 3, 2006 prior to the defendant's

arrest constituted a critical determination by a neutral magistrate, rather than an agent

in the field, that probable cause existed that someone in that residence was committing

a crime.  Since 233 East was the residence of the defendant, it was reasonable for the

agents to believe that the defendant was engaged in criminal activity for which the

search warrant was issued.

> The connection of an occupant to that home [233 East
> Street] gives the police officer an easily identifiable and
> certain basis for determining that suspicion of criminal
> activity justifies a detention of that occupant.

*Michigan v. Summers*, 452 U.S. 692, 703-704 (1981).

This finding of probable cause that criminal activity existed to justify a

search of the defendant's residence, when coupled with all of the other aforesaid

circumstances, provided sufficient probable cause for the agents to arrest the

defendant on February 3, 2006.

Once the defendant was arrested and removed from his vehicle, the agents had a right to search his automobile without a warrant "as a contemporaneous incident of that arrest." *New York v. Belton*, 453 U.S. 454, 460 (1981); *Thornton v. United States*, 541 U.S. 615, 620 (2004). Furthermore, Detective Torre's observation of the defendant putting his "hands above his head into the roof liner of the car" justified the search of that area and the removal of "a bag protruding from that area." (T. 49-53).

> Under the "automobile exception" to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime. *Penn v. Labron*, 518 U.S. 938, 940 (1996); *U.S. v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004).

*United States v. Howard, supra*.

## CONCLUSION

Based on the foregoing, it is RECOMMENDED that the defendant's motion to suppress the use of the evidence seized from his vehicle on February 3, 2006 be in all respects DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

_____This Report, Recommendation and Order be filed with the Clerk of the Court.

        **ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

        The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

        The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:**     **Buffalo, New York**
             **August 15, 2007**